UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**TRENK, DiPASQUALE,
DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
Phone: 973-243-8600
Fax: 973-243-8677
Joseph J. DiPasquale
Henry M. Karwowski
jdipasquale@trenklawfirm.com
hkarwowski@trenklawfirm.com
*Co-Counsel to Biolitec AG and Related Parties*

**THE GRIFFITH FIRM**
45 Broadway, Suite 2200
New York, NY 10006
Phone: (212) 363-3780
Edward Griffith
eg@thegriffithfirm.com
*Co-Counsel to Biolitec AG and Related Parties*

| | |
|---|---|
| In re: | Chapter 11 |
| BIOLITEC, INC., | Case No. 13-11157 (DHS) |
| Debtor. | Honorable Donald H. Steckroth |
| MELANIE CYGANOWSKI, CHAPTER 11 TRUSTEE FOR BIOLITEC, INC.; and ANGIODYMANICS, INC., | Adv. Pro. No. 13-1883 (DHS) |
| Plaintiffs, v. | **DECLARATION OF CEMAL SAGNAK IN SUPPORT OF MOTION TO DISSOLVE OR MODIFY TEMPORARY RESTRAINTS IN SEPTEMBER 3, 2013 ORDER TO SHOW CAUSE** |
| BIOLITEC US, INC.; BIOLITEC AG; BIOLITEC MEDICAL DEVICES, INC.; BIOMED TECHNOLOGY HOLDINGS, LTD.; CERAMOPTEC INDUSTRIES, INC.; BIOLITEC HOLDING US, INC.; BIOLITEC FZ LLC; WOLFGANG NEUBERGER; JACK FURCHT; SCOTT COTE; CEMAL SAGNAK; DAMIAN PLANGE; JOHN DOE; and JANE DOE, | |
| Defendants. | |

**CEMAL SAGNAK**, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am a Defendant in this adversary proceeding and I am the Manager, or "Geschäftsführer," for biomedical technologies GmbH, a subsidiary of Defendant Biolitec AG (the "Company") responsible for sales of medical products. I am also a director of several of the Company's affiliates responsible for distributing the Company's medical products, including Defendant Biolitec U.S., Inc., the Company's medical product distributor in the United States as of August 9, 2013 (the "New U.S. Distributor"). I make this declaration in support of the Defendants' motion to dissolve or modify the temporary restraints contained in the Court's September 3, 2013 Order to Show Cause (the "OSC").

**Background**

1. The Company, through its worldwide affiliates (the "Biolitec Group"), is a global leader in the manufacture of medical devices such as medical lasers, fiber optics, photo-pharmaceuticals and industrial fibers. Before the Court approved the Trustee's sale of the Debtor's assets to AngioDynamics, Inc. ("ADI") on August 9, 2013, the Debtor was the Biolitec Group's distributor of medical products in the United States.

2. As set forth in more detail below, the Debtor did not have any contractual right to continue distributing the Biolitec Group's products. Accordingly, after the Court approved the sale of the Debtor's assets on August 9, 2013, the Biolitec Group's medical products have been distributed in the United States by the New U.S. Distributor.

3. ADI competes with the Biolitec Group in only one segment of the market for medical lasers and fibers. In particular, ADI offers a medical laser and fiber system called "VenaCure EVLT System," which can be used to treat patients with vein disease. ADI's product is in direct competition with the Biolitec Group's medical laser and fiber system called "ELVeS PL," which can also be used to treat patients with vein disease.

4. Both ADI's and the Biolitec Group's vein treatment systems operate in similar ways. A laser is used in conjunction with a disposable fiber that is placed into the patient's leg to apply energy to the vein. ADI's fibers, however, are not compatible, and cannot be used, with the Biolitec Group's lasers. Similarly, the Biolitec Group's fibers are not compatible, and cannot be used, with ADI's lasers.

5. Unlike ADI, however, the Biolitec Group markets and distributes medical lasers and fibers that can be used to treat a variety of other medical conditions, including urology, dermatology, ENT, general surgery, OB/GYN, plastic surgery and wound care. ADI does not manufacture or sell any products that compete with the Biolitec Group's products in these market segments. Most of the Debtor's business fell within two categories, customers that purchased the Biolitec Group's lasers and fibers used to treat vein disease (the "Vein Business") and customers that purchased the Biolitec Group's lasers and fibers used to treat urology conditions (the "Urology Business").

**The Debtor Had No Rights to Continue
Distributing the Biolitec Group's Products**

6. The Debtor never had any contractual rights to distribute the Biolitec Group's products, either before or after the commencement of its chapter 11 case. On the contrary, the Company and the other members of the Biolitec Group (collectively, the "Non-Debtor Affiliates")

have always retained the right to stop using the Debtor as the Biolitec Group's U.S. medical distributor at any time.

7. In her August 4, 2013 declaration, the Trustee expressly acknowledged that the Debtor had no contractual rights to manufacture or sell Biolitec Group products:

> The Debtor is a captive subsidiary without the independent basis to manufacture product or sell product without the support of its affiliated entities.

Trustee Declaration executed August 4, 2913 [ECF 248] at ¶ 16.

8. The Trustee also recognized that because the Debtor had no contractual rights to distribute the Biolitec Group's products, the Non-Debtor Affiliates could stop using the Debtor as the Biolitec Group's U.S. medical distributor and start distributing their medical products in the United States to the Debtor's former customers through another distributor at any time:

> [T]he Non-Debtor Affiliates . . . can, at a moment's notice, stop the supply of product and divert it to other Non-Debtor Affiliates for sale to the Debtor's customers and charge the Debtor for whatever amounts it wants.

*Id.*

### The Debtor's "Customer List" is Neither Exclusive Nor Confidential

9. As the Manager of biomedical technologies GmbH, I have had responsibility for global sales since 2007. Since that time, I have personally attended trade shows and the meetings of medical associations throughout all of the global regions in which the Biolitec Group actively markets its products, including the United States.

10. We maintain actively an extensive global Customer Resource Management system (our "CRM System") with lists of customers and prospective customers. Our lists are maintained independently from any customer lists that our local distributors may keep. The customers maintained in our CRM System Oinclude customers and prospective customers that

4

have been identified over more than two decades from trade shows, meetings or conventions of medical associations and direct inquiries. The CRM System is maintained on our network servers in Europe. The system allows us to generate various lists of customers, including customers by type of product, geographic location and other parameters.

11. Our customer lists, including our lists of US customers and prospective customers, are highly confidential and proprietary information. To my knowledge, the Debtor did not even maintain independent "customer lists" other than the names of customers that appear on the Debtor's account receivables information or that may appear on lists of customers using Biolitec lasers. In addition, I understand that the Debtor's "customer list" that ADI now claims is confidential proprietary information is now in the public domain because it was published in publicly available filings in the Debtor's chapter 11 case, including the Amendment to Schedule B filed on March 6, 2013 [ECF 83 in the chapter 11 case] and the Trustee's Executory Contract Assumption and Cure Notice filed on July 22, 2013 [ECF 198 in the chapter 11 case].

12. I accessed our CRM system to produce a print-out of the Biolitec Group's customers and prospective customers in the United States (the "Non-Debtor Affiliate U.S. Customer List"). I have highlighted each of the customers on that list that also appear on the Trustee's public filing of what she and ADI are calling the Debtor's "customer list." Defendants have moved to file that list under seal in order to protect it from disclosure to our competitor, ADI. I will also bring the list with me to the hearing on this matter for submission to the Court for in camera review.

13. My colleagues at biomedical technologies GmbH and other Non-Debtor Affiliates have regular direct personal contact with the Biolitec Group's customers throughout the world, including those customers in the United States. I am in the United States now to attend the

5

27th Annual World Meeting of the International Union of Phlebology (the medical specialty that focuses on veins and vein disease), which is scheduled to commence in Boston on September 8, 2013. As its name implies, this meeting is attended by medical professionals and medical device manufacturers that specialize in the treatment of vein disease from all over the world.

14. The Biolitec Group's customers from Europe, Asia, the Middle East and the United States will attend this year's meeting. The Biolitec Group's global sales team will also attend, as they attend similar meetings held throughout the world on a regular basis. We always meet with the Biolitec Group's worldwide customers who attend the meetings, including the Biolitec Group's U.S. customers. Unless the temporary restraints are lifted before this weekend, however, I will not be permitted to meet with the Biolitec Group's U.S. customers. This would cause irreparable damage to my relationships with these customers, which I and other members of the Biolitec Group's global sales team have maintained independently from the Debtor for years.

## ADI Cannot Perform the
## Contracts Acquired from the Debtor

15. Although ADI acquired certain contracts between the Debtor and some of its former customers, those contracts require ADI to supply the customer with Biolitec Group medical lasers and fiber optics. Yet neither the Trustee nor ADI have access to the Biolitec Group products necessary to perform the Debtor's customer contracts. A copy of one such contract, which does not permit substitution of Biolitec Group products, is annexed hereto as Exhibit 1.

16. In fact, ADI cannot supply the Debtor's former urology customers with a competing product because ADI does not manufacture or sell products that can be used instead of the Biolitec Group's urology lasers and fibers. Moreover, many of the Debtor's former customers did not have contracts with the Debtor.

17. ADI's purchase of the Debtor's assets, including the Debtor's contracts with its former customers, therefore did not transfer any of the Debtor's "business" to ADI with the Debtor's former customers.

**ADI's False and Deceptive Acts and Practices**

18. Because ADI knows that it cannot perform the Debtor's contracts and is in breach of those contract, ADI has been falsely telling the Debtor's former Vein Customers that they have no choice but to amend their contracts to permit ADI to substitute ADI's vein products for the Biolitec Group vein products to which the customers are contractually entitled.

19. On or about August 13, 2013, for example, ADI distributed a biolitec Acquisition Customer FAQ's and a "welcome letter" to the Debtor's former vein customers in the United States, including the Debtor's former customers in New York. The ADI Customer FAQ falsely states:

> Your contract with [the Debtor] is an asset that AngioDynamics is acquiring as part of the bankruptcy proceeding. *We will honor your current kit purchase contract and pricing* . . .

Exhibit 2 (Customer FAQ's) at Answer to Question 1 (emphasis added).

20. ADI's assertion to the Debtor's former vein customers that it "will honor your current kit purchase contract" is false because ADI cannot perform that contract by selling Biolitec Group products and ADI does not have the right to substitute its products for Biolitec Group products under the customer contracts. Accordingly, it is impossible for ADI to "honor" the Debtor's customer contracts.

21. Similarly, the ADI Customer FAQ also falsely states:

> biolitec lasers and fibers will no longer be legally marketed in the US.

*Id*. at Answer to Question 3.

7

22. As the Trustee has acknowledged, however, the Non-Debtor Affiliates have always had the right to stop distributing their products through the Debtor and to start distributing their products through another affiliate, even "to the Debtor's customers." *See*, *supra*, at ¶8 (quoting Trustee Declaration executed August 4, 2913 [ECF 248] at ¶ 16).

23. The ADI Customer FAQ also falsely states:

> . . . your AngioDynamics sales rep will remove your old biolitec laser.

*Id*. at Answer to Question 10.

24. In fact, ADI has no rights to the Biolitec lasers being used by the Debtor's former customers. The lasers are either owned by another Biolitec Group affiliate, Biolitec Medical Devices, Inc., or they are owned by the customer.

25. On or about August 14, 2013 and August 22, 2013, ADI sent a letter to the Debtor's former customers stating that ADI is "transitioning" the Debtor's former customers to ADI products and that the customers' contracts with the Debtor will be amended to permit substitution of ADI's products. An example of that letter, which was sent to one of the Debtor's former customers in New York County, is annexed hereto as Exhibit 3 (the "Customer Contract Amendment Letter").

26. The Customer Contract Amendment Letter states:

> . . . you entered into a Physician Laser Placement Agreement (the "Agreement" with [the Debtor] . . .
>
> [ADI] is purchasing certain assets of [the Debtor], including its laser and fiber business in the United States. *[ADI] is transitioning [the Debtor's] customers' laser and fiber business to [ADI's] products and amending the Agreement as part of the transaction process.*

Exhibit 3 (Customer Contract Amendment Letter) at first two paragraphs (emphasis added).

27. The Customer Contract Amendment Letter falsely asserts that ADI has the right to amend the customer contracts to permit ADI to substitute its own products for Biolitec Group products – ADI does not have that right. Therefore, ADI is in breach of the customer contracts.

28. The Customer Contract Amendment Letter also fails to inform the Debtor's former customers of several critical facts:

> (i) ADI cannot perform the contract because ADI does not have access to Biolitec Group products to which the customer is entitled under the contract;
>
> (ii) Biolitec Group products continue to be available through Biolitec U.S., Inc.; and
>
> (iii) the customers are not obligated to amend their contracts with the Debtor to permit ADI to substitute its own products for Biolitec Group products.

29. ADI's sales representatives are continuing to falsely assert to consumers of medical lasers and fiber optics products throughout the United States, including the Debtor's former customers, that (i) Biolitec Group products are no longer legally marketed in the United States; and (ii) such consumers have no choice but purchase medical lasers and fiber optics used to treat vein disease from ADI.

30. On August 27, 2013, for example, an ADI representative sent the email annexed hereto as Exhibit 4 to one of the Debtor's former customers in Maryland. That email asserts that:

> (i) "the recent Biolitec judgment [*i.e.*, the Sale Approval Order] had the potential to cause disruption [of the supply of Biolitec Group products] to [the Debtor's former] customers");
>
> (ii) "by cancelling your current . . . contract [with the

      Debtor,] AngioDynamics will not be able to honor
      your current Biolitec fiber cost in the future"; and

  (iii)  "to fully execute the cancellation of the contract . . .
      I will need to come pick up the Biolitec laser to
      return back to [ADI]."

Exhibit 4 (ADI August 27, 2013 email) at third and fifth paragraphs.

  31.  Each of these assertions is false and/or misleading. At least until yesterday, the first assertion was false because, as the Trustee acknowledged, the Non-Debtor Affiliates have always had the right to distribute their products to the Debtor's customers through another affiliate.

  32.  The second assertion is false for two reasons. ADI cannot possibly perform the Debtor's vein contracts because it cannot sell the Biolitec Group's products to which the customer is contractually entitled. In addition, the customer did not "cancel" the contract by not agreeing to ADI's demand to amend it. On the contrary, ADI's demand to amend the contract to permit substitution of ADI's products constitutes a breach of the contract as well as a false and deceptive act designed to mislead the Debtor's former customers into thinking that they are obligated to stop purchasing Biolitec Group products and to start purchasing ADI's competing products.

  33.  The third assertion is also false. ADI does not have the right to remove any of the Biolitec Group lasers in the customers' possession because those lasers are the property of either Biolitec Medical Devices, Inc. or the customers.

### ADI Did Not Purchase
### the Debtor's Former Telephone Number

34. ADI falsely asserts that it purchased the Debtor's former telephone number, 800-934-2377, as part of the Asset Purchase Agreement. The Debtor did not own that telephone number, which has been owned and paid for by CeramOptec Industries, Inc., the one Non-Debtor Affiliate that also owned the offices that the Debtor rented on a month to month basis. As a result, the Asset Purchase Agreement, which I understand was drafted by ADI and the Trustee, does not mention the phone number.

### The New U.S. Distributor Has Not
### Used the Debtor's Former Telephone Number

35. Although ADI did not purchase the Debtor's former telephone number, the Non-Debtor Affiliates did not want to cause any confusion or mislead any of the Debtor's former customers into thinking that the Debtor's assets had not been sold to ADI. Accordingly, as of August 12, 2013, the first business day after the Court approved the Asset Purchase Agreement, the New U.S. Distributor has been using a different telephone number, 800-321-0790, which the Debtor never used.

36. The new telephone number is on all of the New U.S. Distributor's marketing material, including the brochure directed at vein customers annexed hereto as Exhibit 5. All of the New U.S. Distributor's sales representatives have been using the number, which is also on the Company's U.S. website. A copy of that website is annexed hereto as Exhibit 6.

### ADI Did Not Purchase the Company's U.S. Website

37. The Company maintains its website and the websites of various affiliates and distributors in Europe. The Debtor never maintained or owned a separate website. The Asset Purchase Agreement does not include any website.

38. Shortly after the Court approved the Asset Purchase Agreement, the Company's U.S. website was modified to indicate that the New U.S. Distributor (*i.e.*, Biolitec U.S., Inc.) is the Biolitec Group's distributor of medical products in the United States. *See* Exhibit 6 (U.S. website).

**The Non-Debtor Affiliates Are Not
Withholding Any Assets Acquired by ADI**

39. The adversary complaint asserts that the Defendants are refusing to turn over assets that ADI acquired under the Asset Purchase Agreement. The complaint does not identify any particular assets, however, and I am unaware of any such assets that have not been turned over.

40. On the contrary, among the assets acquired by ADI are two "draw towers" leased by the Debtor to CeramOptec Industries, Inc. on a month-to-month basis. Although ADI has not made any attempt to move those assets, CeramOptec Industries, Inc. has demanded that ADI do so and offered to cooperate regarding the logistics of the move. *See* Exhibit 7 (August 28, 2013 email to ADI counsel) at last paragraph.

41. In addition, the Non-Debtor Affiliates fully cooperated with counsel for the Trustee and ADI regarding implementation of the Asset Purchase Agreement. All of ADI's acquired assets were transferred to ADI and the Trustee has removed all of the Debtor's remaining assets and files. *See* Exhibit 8 (August 28, 2013 email to Trustee counsel) at penultimate paragraph.[1]

---

[1] Other email correspondence between counsel is annexed hereto as Exhibit 9.

### ADI's Allegations Regarding
### the Debtor's Former Employees are False

42. ADI's assertions regarding the Debtor's former employees, Defendants Wolfgang Neuberger, Jack Furcht and Scott Cote, are false. First, of those three Defendants, only Jack Furcht was ever employed by the Debtor. Scott Cote is an independent sales representative that marketed the Debtor's products as well as other companies' products. He was under no contractual obligation not to continue marketing the Biolitec Group's medical products after the New U.S. Distributor started distributing those products.

43. Although Dr. Neuberger was formerly the Chief Executive Officer of the Debtor, he was constructively terminated from that position when the Trustee was appointed and excluded him from all management decisions. On Monday, August 12, 2013, the first business day after the Court approved the Debtor's asset sale to ADI, Dr. Neuberger confirmed his constructive termination in an email to the Trustee. See Exhibit 10 (August 12, 2013 email from Dr. Neuberger to the Trustee).

44. ADI's assertion that Jack Furcht or any of the Debtor's other employees resigned as of August 16, 2013 is also false. The Trustee terminated all but two of the Debtor's former employees, including Mr. Furcht. A copy of Mr. Furcht's termination letter, which was effective on August 16, 2013, is annexed hereto as Exhibit 11.

### The Temporary Restraints Are Causing Irreparable Harm
### to the Debtor's Former Customers and to the Non-Debtor Affiliates

45. I received notice of the temporary restraints contained in the Order to Show Cause shortly after I landed in Newark yesterday afternoon. I immediately informed the New U.S. Distributor's sales staff of the Order and instructed them to stop communicating with the Debtor's former customers.

13

46. Today many of the Debtor's customers contacted our sales staff to inquire about the Order, which ADI is actively distributing to them. Copies of two such emails are annexed hereto as Exhibits 12 and 13, respective. As those emails indicate, many of the Debtor's former customers have rejected ADI's unfair and deceptive scare tactics because they want to continue purchasing Biolitec Group products. One of the customers, for example, states, "I'm sure you know but I'll continue purchase until I can't." See Exhibit 12 (September 4, 2013 customer email).

47. Because all consumers of medical lasers and fiber optics need a steady supply of fiber in order to operate their business and care for their patients, the customers have always been customers of the Biolitec Group, will have no choice but to start purchasing products from ADI or another competitor. Once they do that, changing back to Biolitec would be burdensome and time consuming. Even though these customers have resisted ADI's unfair and deceptive tactics, and have affirmatively chosen to continue purchasing Biolitec Group products, they will be deprived of the right to choose between competing products unless the temporary restraints are lifted immediately. Similarly, the New U.S. Distributor and the Non-Debtor Affiliates will also be irreparably harmed by the loss of these customers unless the temporary restraints are lifted immediately. Accordingly, the Non-Debtor Affiliates and the Debtor's former customers cannot wait for the September 23, 2013 hearing without incurring severe irreparable harm from the temporary restraints.

48. It is also imperative that the temporary restraints be modified to allow us to at least notify the customers of this motion seeking to dissolve or modify the temporary restraints. One of the customers reacted to the circulation of the Order to Show by ADI's aggressive sales representative as follows:

> This guy is relentless. Everything still good from your point of view? Will you be sending us a new placement agreement? Please let me know?

Exhibit 13 (another September 4, 2013 customer email).

49. Unless we are permitted to respond to these customer inquiries, the temporary restraints will allow ADI to accomplish what ADI has not been able to accomplish through use of the Debtor's customer lists, through unfair and deceptive business practices or through fair competition.

50. Finally, as the annexed emails indicate, many of the customers would enthusiastically support the motion to dissolve the temporary restraints, but our counsel is currently prohibited from contacting them to request them to do so. Accordingly, we ask that the Court immediately modify the temporary restraints to allow us to notify the customers of this motion and to allow our counsel to contact them for the sole purpose of obtaining their declarations.

I hereby certify under penalty of perjury that the foregoing statements made by me are true and correct to the best of my knowledge, information, and belief.

Executed on September 4, 2013.

_____
CEMAL SAGNAK