**NOT FOR PUBLICATION**

**FILED**

JAMES J. WALDRON, CLERK

**JAN. 22, 2015**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ *Ronnie Plasner*

JUDICIAL ASSISTANT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.:  13-11157 (DHS) |
| **BIOLITEC, INC.,** | Judge:  Donald H. Steckroth, U.S.B.J. |
| Debtor. | |

| | |
|---|---|
| **MELANIE CYGANOWSKI, as Chapter 11 Trustee for Biolitec, Inc., and ANGIODYNAMICS, INC.** | Adv. No.:  13-01883  (DHS) |
| Plaintiffs, | |
| **v.** | |
| **BIOLITEC U.S. INC.; BIOLITEC AG; BIOLITEC MEDICAL DEVICES, INC.; BIOMED TECHNOLOGY HOLDINGS LTD.; CERAMOPTEC INDUSTRIES, INC.; BIOLITEC HOLDING US, INC.; BIOLITEC FZ LLC; WOLFGANG NEUBERGER; JACK FURCHT; SCOTT COTE; CEMAL SAGNAK; DAMIAN PLANGE; JOHN DOE and JANE DOE** | **OPINION** |
| Defendants. | |

**APPEARANCES:**

| | |
|---|---|
| Bond Schoeneck & King, PLLC | Trenk, DiPasquale, Della, Fera & Sodono, P.C. |
| Joseph Zagraniczny, Esq. | Joseph J. DiPasquale, Esq. |
| Stephen A. Donato, Esq. | Henry M. Karwowski, Esq. |
| Sara C. Temes, Esq. | 347 Mount Pleasant Avenue, Suite 300 |
| One Lincoln Center | West Orange, New Jersey 07052 |
| Syracuse, New York 13224 | ***Co-Counsel for Biolitec AG*** |
| ***Co-Counsel for Plaintiff,*** | ***and Related Parties*** |
| ***AngioDynamics, Inc.*** | |

| | |
|---|---|
| Webber McGill LLC | The Griffith Firm |
| Douglas J. McGill, Esq. | Edward Griffith, Esq. |
| 760 Route 10 West, Suite 104 | 45 Broadway, Suite 2200 |
| Whippany, New Jersey 07981 | New York, New York 10006 |
| ***Co-Counsel for Plaintiff,*** | ***Co-Counsel for Biolitec AG*** |
| ***AngioDynamics, Inc.*** | ***and Related Parties*** |

Otterbourg, Steindler, Houston & Rosen, P.C.
David Posner, Esq.
230 Park Avenue
New York, New York 10169-0075
(212) 661-91 00
***Counsel for Chapter 11 Trustee,***
***Melanie L. Cyganowski***

McDonnell Crowley, LLC
Brian T. Crowley, Esq.
John Michael McDonnell
115 Maple Avenue
Red Bank, New Jersey 0770 l
***Local Counsel for Chapter 11 Trustee,***
***Melanie L. Cyganowski***

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Melanie L. Cyganowski, as Chapter 11 Trustee (the "Trustee") for the estate of Biolitec, Inc. ("Biolitec" or the "Debtor"), and AngioDynamics, Inc. ("AngioDynamics") (collectively, the "Plaintiffs") applied for an order to show cause with temporary restraints (the "Application") against Biolitec U.S., Inc. ("New Biolitec"), Biolitec AG, Biolitec Medical Devices, Inc., Biomed Technology Holdings Ltd. ("Biomed"), CeramOptec Industries, Inc., Biolitec Holding US, Inc. ("Holding"), Biolitec FZ LLC ("Biolitec FZ"), Wolfgang Neuberger ("Neuberger"), Jack Furcht ("Furcht"), Scott Cote ("Cote"), Cemal Sagnak ("Sagnak"), Damian Plange, John Doe and Jane Doe (collectively, the "Defendants").  Based on evidence indicating that the Defendants may have violated this Court's order approving the sale of substantially all of the Debtor's assets, including its customer lists, historical customer files, and goodwill, by soliciting sales from former customers of the Debtor, the Court granted the Application over the Defendants' objection. (Order to Show Cause with Temporary Restraints, Sept. 3, 2013, ECF No. 5)  The temporary restraints enjoined the Defendants from soliciting or contacting the Debtor's former customers. (*Id.*)

The Defendants moved to dissolve or modify the temporary restraining order.  With the consent of the Plaintiffs, the order was amended to exclude restraints against contact with the Debtor's former non-vein customers. (*See* Am. Order to Show Cause with Temporary Restraints, Sept. 6, 2013, ECF No. 13); (Second Am. Order to Show Cause with Temporary Restraints ("TRO"), Sept.12, 2013, ECF No. 34)

Evidentiary hearings on the parties' motions regarding preliminary injunctive relief were conducted with the Court holding the TRO in place pending the issuance of an opinion.  It was subsequently agreed that, pursuant to Federal Rule of Civil Procedure 65(a)(2), the evidentiary

hearings would constitute a trial on the merits of AngioDynamics's claims against the Defendants. (*See* Second Amended Joint Order Scheduling Pretrial Proceedings and Trial, Apr. 30, 2014, ECF No. 110).

The Plaintiffs seek a permanent injunction restraining the Defendants from contacting or doing business with the Debtor's former vein customers for a period of two years following the entry of injunctive relief. They argue that the Defendants' establishment of a new Biolitec entity for the purpose of continuing the Debtor's business after the sale of substantially all of the Debtor's assets violated this Court's sale order and applicable law, causing AngioDynamics irreparable harm. Conversely, the Defendants argue that their conduct complied with this Court's order because AngioDynamics did not purchase the exclusive right to the Debtor's customer information. They argue further that injunctive relief is inappropriate because it will deprive some of the Debtor's former customers of the freedom to purchase Biolitec products and force them to purchase AngioDynamics's competing endovenous laser system and fibers, which they claim are not equivalent. Finally, as a threshold issue, the Defendants argue that the Court lacks jurisdiction over the instant adversary proceeding, which they maintain is solely a dispute between non-debtor parties that involves assets transferred out of the bankruptcy estate pursuant to an asset purchase agreement.

## FINDINGS OF FACT

The Debtor was a member of a multi-national group of companies in the business of manufacturing and distributing fiber optic devices, medical lasers and fibers, photo-pharmaceuticals, and industrial fiber optics (the "Biolitec Group").[1] (Decl. of Cemal Sagnak in

---

[1] The organizational structure of the Biolitec Group is very complex. Neuberger is the sole owner of BioMed. BioMed is the majority owner of Biolitec AG, holding a 75% interest. Biolitec AG is the parent to Biolitec AG

Supp. of Mot. to Dissolve or Modify Temporary Restraints in September 3, 2013 Order to Show

Cause ("Sagnak Decl.") at ¶ 1, Sept. 4, 2013, ECF No. 10-1)  Wolfgang Neuberger was the

President, CEO, and Chairman of the Board of the Debtor and exercised significant ownership

and control over the operations of the Biolitec Group and its numerous affiliated entities. (Pls.'

Adv. Compl. for Temporary, Prelim. and Permanent Injunctive Relief, Turnover of Estate

Property, Costs, Sanctions and Other Relief ("Compl.") at ¶¶ 21-23, Aug. 30, 2013, ECF No. 1)

The Biolitec Group serves global markets including Europe, Asia, the Middle East, and the

United States, and the Debtor was the Group's United States affiliate "responsible for

distributing the Group's medical products in the United States."  (Decl. of Dietmar Meyersiek

("Meyersiek Decl.") at ¶ 2, In re Biolitec, Inc., No. 13-11157 (Bankr. D.N.J. Aug. 1. 2013) ECF

No. 230)  The Debtor sold medical lasers and optical fibers for medical procedures, focusing on

the endovenous laser treatment of varicose veins and various post-operative urological

procedures.  (Defs.' Mem. of Law in Opp'n to Pls.' Mot. Prelim. Injunctive Relief ("Defs.'

Opp'n") at 2, Sept. 19, 2013, ECF No. 49)  While the Debtor's marketing activities were global,

its sales and customer relationships were concentrated within the United States.  (Order to Show

Cause Hr'g Tr. ("Sept. 30 Hr'g Tr.") at 121:6-12, Sept. 30, 2013, ECF No. 113)

Jack Furcht ("Furcht") was the Debtor's National Sales Manager from 2001 until the

Trustee terminated his employment in August 2013.  (Sept. 30 Hr'g Tr. at 135:20-23; 139:15-22)

Furcht testified that, over the course of his employment, the Biolitec Group distributed all of its

medical products in the United States through the Debtor.  (Id.)  Although there was never a

---

Austria, Biolitec FZ, and until December 2011, was the 90% owner of Biolitec, the Debtor.  As of December 2011, the 90% of Biolitec that was held by Biolitec AG was transferred to Biolitec Holdings US, Inc., which is the wholly-owned subsidiary of Biolitec FZ.  Neuberger is also the sole owner of the following entities: Biolitec Pharma Marketing, Ltd., CeramOptec GmbH, Biolitec Pharma, Ltd., and Biolitec SIA.  *See AngioDynamics, Inc. v. Biolitec, Inc.*, No. 09-CV-30181, 2011 WL 3157312, at *1 (D. Mass. July 25, 2011).

written contract between the parties, the Biolitec Group would supply the Debtor with lasers and fibers at below-market rates and the Debtor would market and sell these products pursuant to its contracts with medical professionals.  (Decl. of Brian Foley at ¶ 3, In re Biolitec, Inc., No. 13-11157 (Bankr. D.N.J. Aug. 1, 2013) ECF No. 229)  Most of the Debtor's business fell within two areas: customers purchasing the Biolitec Group's lasers and fibers used to treat vein disease and customers purchasing the Biolitec Group's lasers and fibers used to treat urology conditions. (Sagnak Decl. at ¶ 5)

Similarly, AngioDynamics develops, manufactures, markets, sells, and distributes bio-lasers and laser fibers for use by doctors in the treatment of vein disease.  (Compl. at ¶ 6)  The vein treatment systems of both the Biolitec Group and AngioDynamics employ comparable technologies, using a laser in conjunction with a disposable fiber that applies energy to a patient's vein.  (Sagnak Decl. at ¶ 4)  The Biolitec Group, however, markets and distributes medical lasers and fibers that can be used to treat a variety of other medical conditions in fields including urology, dermatology, ear, nose, and throat, general surgery, obstetrics and gynecology, plastic surgery, and wound care.  (*Id.* at ¶ 5).  AngioDynamics does not manufacture or sell any products that compete with the Biolitec Group's products in these market segments and only sells products that are used to treat vein disease or perform endovenous procedures. (*Id.*)

It is not difficult for physicians to switch between the products sold by AngioDynamics and those sold by the Biolitec Group.  Satish Vayuvegula, M.D., the Regional Medical Director for Vein Clinics of America, which is comprised of fifty clinics that perform endovenous laser ablation, stated that in "April and May 2013, all of the [Vein Clinics of America] doctors that were using Biolitec products—more than two dozen nationwide—switched to AngioDynamics

6

products.  As a Regional Medical Director, I observed that this transition went smoothly and has been a success for VCA as a whole." (Decl. of Satish Vayuvegula, M.D. at ¶¶ 1-3, Sept. 24, 2013, ECF No. 56)  Dr. Lowell S. Kabnick, Director of the New York University Vein Center, explained that "[m]any doctors, including myself, have used endovenous ablation products from multiple companies, including AngioDynamics [and] Biolitec . . . Many doctors switch from one supplier to another over time, and a number of doctors interchange between laser and [radiofrequency], as I do." (Decl. of Lowell S. Kabnick, M.D. at ¶ 7, Sept. 24, 2013, ECF No. 54)  Dr. Kabnick also testified to no real difference in patient outcomes or efficacy of vein closure.  (Sept. 30 Hr'g Tr. at 70:2-10)

Dr. John Mauriello, who testified for the Defendants, stated that both AngioDynamics and Biolitec products were "very good products."  (Sept. 30 Hr'g Tr. at 104:8)  He furthered stated that he had no control over which company's products were used, as this decision was made by the head of his practice group, and that if he could not purchase Biolitec products he would "[w]ithout a doubt" use AngioDynamics's products instead.  (*Id.* at 101:14-23)  Furcht, the Debtor's former National Sales Manager in the United States, also acknowledged that the transition from Biolitec endovenous products to AngioDynamics products would be relatively simple for doctors.  (*Id.* at 137:13-18)

The Debtor, the Defendants, and AngioDynamics have been parties to several proceedings in different courts.  Because the claims in those proceedings are relevant to the Court's decision on the requested injunctive relief, a brief summary is warranted.

**The New York Litigation**

The Debtor and AngioDynamics were parties to a Supply and Distribution Agreement ("SDA") dated April 1, 2002. (Compl. at ¶ 30)  Under the SDA, AngioDynamics was given the exclusive right to distribute certain endovenous Biolitec products in the United States and Canada over a period of five years. *See AngioDynamics, Inc. v. Biolitec, Inc.*, No. 09-CV-30181, 2011 WL 3157312 at *1 (D. Mass. July 25, 2011).  The SDA also provided that the Debtor had a duty to defend and indemnify AngioDynamics against any patent infringement claims brought against it as a result of its distribution of the Debtor's products.  (*Id*.)  During 2004 and 2005, AngioDynamics was sued by two different competitors for patent infringement.  From 2004 through 2008, AngioDynamics incurred $19 million in settlement costs and $4 million in legal costs defending against the patent infringement suits, which the Debtor refused to defend or indemnify.  (*Id.* at ¶ 31)  In January of 2008, AngioDynamics brought suit against the Debtor for breach of the indemnification provisions of the SDA in the United States District Court for the Northern District of New York (the "New York Litigation").  *See AngioDynamics, Inc. v. Biolitec, Inc*., 606 F. Supp. 2d 300 (N.D.N.Y. 2009).

In November of 2012, the New York District Court awarded AngioDynamics a judgment in the amount of approximately $23 million ("New York Judgment").  The Debtor perfected its appeal of the New York Judgment in the United States Court of Appeals for the Second Circuit on January 18, 2013.  On July 18, 2013, Biolitec FZ filed a motion to intervene in the Debtor's appeal of the New York Judgment based on an alleged assignment of an interest in the litigation that this Court had previously found to be void. (*See* Order Expunging Proof of Claim of Biolitec FZ LLC, In re Biolitec, Inc., No. 13-11157 (Bankr. D.N.J. Aug. 9, 2013) ECF No. 260)  On

August 23, 2013, the Second Circuit denied Biolitec FZ's Motion to Intervene and approved the dismissal of the appeal with prejudice.

**The Massachusetts Litigation**

In October of 2009, fearing that Biolitec was systematically funneling assets to certain of the Defendants to make any potential judgment in the New York Litigation uncollectible, AngioDynamics brought suit in the United States District Court for the District of Massachusetts (the "Massachusetts Litigation"). *See AngioDynamics, Inc. v. Biolitec, Inc.,* 09-CV-30181-MAP, 2011 WL 3157312, at *2 (D. Mass. July 25, 2011). The complaint alleged that Biolitec AG, BioMed, and Neuberger fraudulently transferred approximately $18 million in assets to render the Debtor judgment proof. *Id.* The complaint sought to pierce the corporate veil, to collect judgment from the parent and related entities of Biolitec, and to avoid the alleged fraudulent transfers. *Id.*

In August of 2012, AngioDynamics sought a preliminary injunction in the Massachusetts Litigation to freeze the defendants' assets and prohibit Biolitec AG from completing a downstream merger with an Austrian subsidiary, Biolitec AG Austria. *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 348 (D. Mass. 2012). The Massachusetts District Court first entered a temporary restraining order and then a preliminary injunction. The injunction prevented Biolitec from transferring its assets and prohibited Biolitec AG from merging with Biolitec AG Austria. *Id. a*t 349. The United States Court of Appeals for the First Circuit affirmed the Massachusetts District Court's ruling on April 1, 2013. *See AngioDynamics, Inc. v. Biolitec AG*, 711 F.3d 248 (1st Cir. 2013).

On April 3, 2013, two days after the First Circuit affirmed the Massachusetts District Court's grant of the injunction, Biolitec AG went ahead and violated the injunction by merging with its Austrian subsidiary.  *See AngioDynamics, Inc. v. Biolitec AG,* 09-CV-30181-MAP, 2013 WL 1567739 (D. Mass. Apr. 11, 2013) ("Defendants Wolfgang Neuberger, Biolitec AG ('BAG'), and Biomed Technology Holdings, Ltd. ('Biomed') flagrantly and intentionally violated a preliminary injunction issued by this court.").  Thereafter, Neuberger, as president of the Debtor, and person in control of Biolitec AG and Biomed, refused to comply with the Massachusetts District Court's order requiring him to appear personally to explain his actions. (Compl. at ¶ 39)  The Court issued a warrant for Neuberger's arrest and imposed a series of fines in excess of $15 million against the Debtor.  (*Id.*)  These remain outstanding.

Since the merger, the defendants in the Massachusetts Litigation have continually refused to comply with discovery orders, leading the court to enter default judgment in favor of AngioDynamics on March 18, 2014.  *See AngioDynamics, Inc. v. Biolitec AG*, 991 F. Supp. 2d 299, 302 (D. Mass. 2014).  The court awarded AngioDynamics a $74,920,422.57 judgment on its various fraudulent transfer claims against Biolitec AG, Biomed, and Neuberger.  (*Id.* at 307)  To date, the defendants remain in violation of the injunction, have failed to pay any of the fines imposed in the Massachusetts Litigation, and the arrest warrant for Neuberger remains in place. (*Id.*)

**The Bankruptcy Proceeding**

Biolitec filed its petition for chapter 11 relief on January 22, 2013 and immediately moved for relief from the automatic stay to allow the pending district court litigations to continue.  Based on the New York Judgment, AngioDynamics filed a general unsecured claim in

the Debtor's bankruptcy case in the amount of $23,889,613.89.    (Compl. at ¶ 41)

AngioDynamics moved for the appointment of a chapter 11 trustee, and, having serious concerns

about the ability of the Debtor's management to administer assets for the benefit of the estate and

its creditors, the Court entered an order appointing a trustee on April 4, 2013.  The United States

Trustee appointed Melanie Cyganowski as the chapter 11 trustee in the case (the Trustee") on

April 11, 2013.

Following the appointment of the Trustee, AngioDynamics and the Trustee engaged in

settlement discussions.  (*Id.* at ¶ 40)   On July 16, 2013, the Trustee, on behalf of the Debtor, and

AngioDynamics entered into a settlement agreement (the "Settlement Agreement") to dismiss

the Second Circuit Appeal and provide for the treatment of AngioDynamics's claim.  (*Id.* at ¶ 44)

The settlement fixed AngioDynamics's allowed unsecured claim at $29 million, but provided

that AngioDynamics would forego any distribution from the estate on the approximately $23

claim arising out of the New York Judgment and would receive a distribution on the remaining

$6 million only if all general unsecured claims (excluding those of the Debtor's affiliates) were

paid in full.  Essentially, AngioDynamics agreed that instead of recovering from the Debtor, any

potential recovery would come from Biolitec AG or the other defendants in the Massachusetts

Litigation.  In conjunction with the Settlement Agreement, the parties entered into an Asset

Purchase Agreement that provided for the sale of substantially all of the Debtor's assets to

AngioDynamics pursuant to section 363 of the Bankruptcy Code.  (Asset Purchase Agreement

("APA"), Order Authorizing the Trustee's Entry into the Asset Purchase Agreement, In re

Biolitec, Inc., No. 13-11157 (Bankr. D.N.J. Aug. 9, 2013) ECF No. 259-1)  The APA defines

"Acquired Assets" to include "all of the properties, assets, and rights of Seller, wherever located,

whether personal, tangible or intangible."  (*Id.* at § 1.1)  The definition of "Acquired Assets"

expressly includes the Debtor's customer lists, goodwill, and 29 specified customer contracts. (*Id.* at §§ 1.1(b),(f),(o) at 2-4)  The 29 customer contracts acquired by AngioDynamics include 21 contracts with vein doctors.[2] (*Id.* at Schedule 1.1(b))  The contracts provide doctors with free use of an endovenous laser in return for the obligation to purchase a minimum number of fibers from the Debtor each month for use with the laser.  (*See* Defs.' Proposed Findings of Fact and Conclusions of Law Dismissing Pls.' Compl. ("Defs.' Concl. Of Law") at ¶ 13 of 24, May 14, 2014, ECF No. 112)   The contracts permit removal of the laser if the minimum number of fiber purchases are not made and give the Debtor the right to "introduce new, discontinue or modify products at any time and reserves the right to substitute . . . equivalent fibers at its sole discretion." (*See* Physician Laser Placement Agreement, Motion to Dissolve or Modify Temporary Restraints at 5, Ex. 1 to Decl. of Sagnak, Schedule B, Sept. 4, 2013, ECF No. 10-2)

Over the course of the negotiation process and prior to entering into the APA, AngioDynamics performed due diligence by requesting customer information from the Trustee. (Order to Show Cause Hr'g Tr. ("Oct. 1 Hr'g Tr.") at 6:13-18, October 1, 2013, ECF No. 114) AngioDynamics refused to enter the APA until the Trustee agreed to provide data regarding specific customers and their purchasing histories so that AngioDynamics could properly evaluate the value of the contracts and customer lists it was considering acquiring.  (*Id.* at 6:23-7:3)  A majority of the information was received after most of the terms of the APA had been agreed upon, but prior to the signing of the agreement.  (*Id.* at 6:20-22)

A hearing on the sale motion and Settlement Agreement was held on August 6, 2013.  At the hearing, the Defendants asserted numerous objections to particular assets proposed to be sold as property of the Debtor's estate.   The Defendants successfully argued that CeramOptec

---

[2] Schedule 1.1(b) of the APA shows that there are 21 contracts, two of which are with the same customer.  Thus, there are 21 vein contracts and 20 vein contract customers.

Industries, Inc. and Biolitec Medical Devices, Inc. were not owned by the Debtor, and these entities were removed from the definition of Acquired Assets and not transferred as a result of the sale. Notably, however, the Defendants raised no objections regarding the Debtor's ownership of its customer information, goodwill, or any other assets.

The Court entered orders approving the APA and Settlement Agreement on August 9, 2013. (*See* Order Authorizing the Trustee's Entry into the Asset Purchase Agreement ("Sale Order"), In re Biolitec, Inc., No. 13-11157 (Bankr. D.N.J. Aug. 9, 2013) ECF No. 259); (Order Approving the Settlement Agreement with AngioDynamics, Inc. and Authorizing the Trustee's Entry into the Settlement Agreement, In re Biolitec, Inc., No. 13-11157 (Bankr. D.N.J. Aug. 9, 2013) ECF No. 261) The Sale Order provides that Acquired Assets constituted property of the Debtor's estate. (Sale Order at ¶ M ("The Acquired Assets, other than any purported ownership interests in CeramOptec Industries, Inc. and Biolitec Medical Devices, Inc., are property of the Debtor's estate and title thereto is vested in the Debtor's estate.")) It further provides that the sale would be a legal, valid and effective transfer, vesting AngioDynamics "with all right, title and interest of the Debtor to the Acquired Assets free and clear of any and all encumbrances." (*Id.* at ¶ P) Accordingly, the Debtor and the Defendants were obligated to surrender possession of the Acquired Assets to AngioDynamics on the closing date. (*Id.* at ¶ 19) Upon entry of the Sale Order, no creditor or other party in interest was to "take or cause to be taken any action that would interfere with the transfer of the Acquired Assets to the Buyer." (*Id.* at ¶ 22) The Sale Order proscribed the Debtor's affiliates from interfering with the Debtor's assets or the transfer of such assets and, significantly, expressly prohibited them from using the Debtor's customer lists. (*Id.* at ¶ 31) ("Debtor's affiliates . . . shall not exercise control over or use the Debtor's customer lists.")

13

On July 18, 2013, Biolitec FZ filed a motion to intervene in Biolitec's appeal of the New York Judgment.   Because the closing of the sale under the APA was conditioned on the withdrawal of the Debtor's appeal, the motion to intervene prevented withdrawal and delayed the closing.   (Sept. 30 Hr'g Tr. at 44:16-22)   Due to the delay, the Trustee authorized AngioDynamics to contact the Debtor's customers in the interim prior to closing.  (Oct. 1 Hr'g Tr. at 14:25-15:8)  On August 13, 2013, AngioDynamics sent a fact sheet that included the false statement that "[B]iolitec lasers and fibers will no longer be legally marketed in the US" to 55 of the Debtor's former customers.   (Sept. 30 Hr'g Tr. at 14:12-15)   On August 14, 2013, AngioDynamics sent a letter to the Debtor's vein customers informing them that AngioDynamics would be amending their contracts and transitioning those customers from Biolitec Group products to AngioDynamics products. (Oct. 1 Hr'g Tr. at 84:20-22; 85:15-22)

On August 23, 2013, the Second Circuit denied Biolitec FZ's Motion to Intervene and approved the dismissal of the appeal with prejudice.  The sale closed pursuant to the APA on August 26, 2013.

**Incorporation of New Biolitec**

Neuberger incorporated Biolitec U.S., Inc. ("New Biolitec") for the purpose of continuing the Debtor's business four days before the Sale Order was entered.  (Sept. 30 Hr'g Tr. at 124:7-10, 22-25)  New Biolitec operates out of the same facility where the Debtor was located and many of the employees who formerly worked for the Debtor were later hired by New Biolitec.  (*Id*. at 125:7-13)  Furcht was one such employee and he admitted that he was surprised to learn of the new company's formation.  (*Id*. at 124:14-17)  Upon entry of the Sale Order, the

Trustee notified the Debtor's employees, including Furcht, that they would be terminated. (Defs.' Concl. of Law at ¶ 33)

Prior to receiving his termination letter from the Trustee, Furcht was informed by Cemal Sagnak, the Debtor's Director of Business Development, that New Biolitec would be in the business of distributing Biolitec Group products. (Sept. 30 Hr'g at Tr. 132:8-22) Sagnak also told Furcht that New Biolitec would distribute the products formerly distributed by the Debtor using the same website and telephone number. (*Id*. at 132:19-133:3) During the week of August 19, 2013, Sagnak offered Furcht a position as Director of Endovenous Sales for New Biolitec, the same position he previously held with the Debtor. (Defs.' Concl. of Law at ¶ 38) Scott Cote, the Debtor's endovenous sales representative for Southern California and Arizona prior to his termination by the Trustee, also went on to work for New Biolitec in the same capacity he previously held with the Debtor. (*Id.* at ¶¶ 34, 38)

Despite the express prohibitions of the Sale Order, New Biolitec contacted the Debtor's former endovenous customers and sold products from at least August 16, 2013 until the entry of the initial temporary restraining order on September 3, 2013. (Sept. 30 Hr'g Tr. at 119:3-6; 133:3-11; 138:20-24) On August 21, 2013, New Biolitec distributed a fact sheet to 35 of the Debtor's former endovenous customers that stated that New Biolitec would now distribute medical products formerly distributed by the Debtor and that these products were available for purchase by anyone. (*See* Application for Order to Show Cause, Declaration of Stephen A. Trowbridge, Ex. C ("Fact Sheet"), Aug. 29, 2013, ECF No. 2); (Sept. 30 Hr'g Tr. 138:5-24); (Oct. 1 Hr'g Tr. 107:1-5)

**Adversary Proceeding and Subsequent Events**

On August 29, 2013, the Plaintiffs instituted this adversary proceeding with the filing of a verified complaint ("Complaint") seeking enforcement of the automatic stay, turnover of property of the estate, avoidance and recovery of post-petition transfers, and various state law claims. (Compl. at ¶¶ 50-81)  Pursuant to Federal Rule of Bankruptcy Procedure 7065, the Court entered an order to show cause with temporary restraints on September 3, 2013, enjoining the Defendants from soliciting or contacting the Debtor's former customers.  (Order to Show Cause with Temporary Restraints, Sept. 3, 2013, ECF No. 5)  With the Plaintiffs' consent, the order was amended on September 6, 2013 to exclude the Defendants' urology business from the restraint, thus limiting its scope.  (*See* Am. Order to Show Cause with Temporary Restraints, Sept. 6, 2013, ECF No. 13)  The order was amended a second time to exclude all of the Debtor's non-vein customers from the restraint.  (*See* Second Am. Order to Show Cause with Temporary Restraints ("TRO"), Sept. 12, 2013, ECF No. 34)  In its final form, the TRO bars the Defendants from "contacting or communicating in any way with" any of the Debtor's former vein customers. (*Id.* at 5, ¶ C)  The sole exception to the prohibition of contact with the Debtor's former vein customers is that the counsel for the Defendants was permitted to communicate with the former customers of the Debtor for the purpose of obtaining declarations in support of the Defendants' opposition to the TRO.  (*Id.* at 7, ¶ E)

On September 30, 2013 and October 1, 2013, the Court conducted evidentiary hearings that included the testimony of representatives from AngioDynamics, the Debtor, and the Defendants, as well as from several doctors with experience using the parties' endovenous products.  The restraints in place under the TRO were ordered to remain in effect pending the parties' submissions of proposed findings of facts and conclusions of law.  The parties submitted

16

their proposed findings of fact and conclusions of law and agreed that, pursuant to Federal Rule of Civil Procedure 65(a)(2), the evidentiary hearings would constitute a trial on the merits of AngioDynamics's claims against the Defendants.  (*See* Second Amended Joint Order Scheduling Pretrial Proceedings and Trial, Apr. 30, 2014, ECF No. 110).

AngioDynamics seeks a permanent injunction holding the restraints imposed under the TRO in place for a period of two years.  The Defendants argue that the restraints should be vacated and the Complaint dismissed because they cannot be barred from contacting former customers of the Debtor since the asset sale did not give AngioDynamics the exclusive right to transact with the Debtor's former customers.

## DISCUSSION

### I.   Subject Matter Jurisdiction

Bankruptcy courts may have jurisdiction over four types of title 11 matters: "(1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11."  *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991).  The first category, cases under title 11, "refers merely to the bankruptcy petition itself."  *Matter of Wood,* 825 F.2d 90, 92 (5th Cir. 1987).  Because the present action goes beyond the bankruptcy petition itself, the remaining three categories must be considered in determining whether this Court is competent to hear the case.  The remaining three categories "operate conjunctively to define the scope of jurisdiction," and thus "it is necessary only to determine whether a matter is at least 'related to' the bankruptcy."  *Matter of Wood*, 825 F.2d 90, 92 (5th Cir. 1987) (citing *In re Wolverine Radio Co.*, 930 F.2d 1132, 1142 (6th Cir. 1991)).

The Third Circuit has held that "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also Marcus Hook*, 943 F.2d at 264 ("A proceeding is related to bankruptcy if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.") (internal quotations omitted). Subject matter jurisdiction is evaluated "before, not after, adjudication of the merits and depends on the nature, not the validity, of the plaintiff's claim." *In re Allegheny Health Educ. & Research Found*, 383 F.3d 169, 176 (3d Cir. 2004).

The Defendants rely on *In re Hall's Motor Transit Co.,* 889 F.2d 520 (3d Cir. 1989) to support their argument that the Court does not have subject-matter jurisdiction over the instant dispute.  In *Hall's Motor,* the purchaser obtained the debtor's property in a sale approved by the bankruptcy court.  Subsequently, the purchaser brought an action in the bankruptcy court to enjoin enforcement of a zoning law that changed during completion of the contract of sale.  The bankruptcy court's order approving the sale of the debtor's assets did not address the zoning issue and purchaser did not contest the order of sale in his action seeking to enjoin enforcement of the new zoning ordinance.  The Third Circuit held that the bankruptcy court was not competent to hear the complaint, reasoning that its "jurisdiction does not follow the property, but rather, lapses when the property leaves the debtor's estate." *Id.* at 522.

Despite the holding in *Hall's Motor*, jurisdiction may be retained even after the transfer of property from the debtor's estate if the relief sought directly implicates bankruptcy court orders.  Section 105(a) of the Bankruptcy Code gives bankruptcy courts the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a).  Courts have held that section 105 "gives the bankruptcy court both

the power to issue a sale order and 'the power and the jurisdiction to enforce its valid orders.'" *In

re Marcus Hook Dev. Park, Inc.,* 943 F.2d at 266 (citing *In re Radco Merchandising Services,*

*Inc.,* 111 B.R. 684, 688-89 (N.D. Ill. 1990)).

      In *Marcus Hook*, the bankruptcy court entered a sale order that conflicted with an order

approving a disclosure statement.  *In re Marcus Hook,* 943 F.2d at 262-63.  The purchaser of the

debtor's assets filed an objection to the debtor's motion for a final decree, seeking interpretation

of the bankruptcy court's orders.  The Third Circuit held that the proceeding was related to

bankruptcy, noting that "[u]nlike the requested relief in *Hall's Motor . . .* which did not contest

the order of sale and which therefore only tangentially touched the bankruptcy proceedings, the

relief sought here directly implicates the conflicting bankruptcy court orders." *Id.* at 266.

      Similarly, in *In re Allegheny Health*, the purchaser of the debtor's assets brought an

adversary proceeding seeking to vacate an arbitration award in favor of a union that represented

employees that worked at the debtor's hospitals.  *In re Allegheny Health Educ. & Research*

*Foundation*, 383 F.3d 169, 174 (3d Cir. 2004).  The purchaser also sought indemnification from

the debtor for the cost of the arbitration award.  The bankruptcy court held that the purchaser

assumed liability for a portion of the arbitration award under the sale agreement, and that the

estate had no obligation to indemnify the purchaser.  The court then reasoned that it lacked

subject matter jurisdiction over the dispute between the union and the purchaser regarding

enforcement of this portion of the award because adjudication of the dispute would have no

effect on estate property.  On appeal, the Third Circuit found that the bankruptcy court erred

when it held that "jurisdiction disappeared once the court construed the asset purchase agreement

and sale orders to bind [the purchaser]." *Id.* at 176.  Even if the outcome of the dispute would

have no effect on the estate, the bankruptcy court retained jurisdiction because the dispute "required the court to interpret and give effect to its previous sale orders." *Id.*; s*ee also In re IPDN Corp.*, 352 B.R. 870, 877 (Bankr. E.D. Miss. 2006) (holding that bankruptcy courts have "jurisdiction not only to enter a sale order but also to interpret and enforce that order, even when the sale order dispute is between nondebtor parties and the debtor is not affected by the outcome.").

Here, the terms of the Sale Order expressly affirm the type of jurisdiction authorized by the Third Circuit in *Marcus Hook* and *Allegheny Health*.  Paragraph 40 of the Sale Order gives this Court jurisdiction to:

> enforce the terms and provisions of this Order and the APA in all respects and to decide any disputes concerning this Order, the APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APA and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Acquired Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets free and clear of all Encumbrances.

(Sale Order ¶ 40)  While it is true that the property at issue here no longer belongs to the estate because it was sold to AngioDynamics, it is clear that the Court has jurisdiction over the instant matter.  There is no doubt that the Court has jurisdiction over the claims asserting that the Defendants' conduct impaired the value of the Debtor's assets prior to the closing of the sale because these claims directly implicate "the debtor's rights, liabilities, options, or freedom of action" and implicate the "handling and administration of the bankrupt estate." *In re Smith*, 866 F.2d 576, 580 (3d Cir. 1989).  The Court also has jurisdiction over the remaining claims because they concern the interpretation and enforcement of the Sale Order controlling the disposition of estate property.  With regard to these claims, the Plaintiffs assert that the Defendants' contact

with the Debtor's former customers violated the Sale Order and applicable law and interfered

with the transfer of rights associated with the Acquired Assets purchased by AngioDynamics.

The Defendants assert that their conduct did not violate the rights of any party because the sale

of customer information and goodwill did not transfer exclusive rights to such assets.  (Defs.'

Opp'n at 5)  Thus, the present adversary proceeding concerns the scope of the property and

rights acquired by AngioDynamics and requires the Court to interpret and give effect to the Sale

Order, APA, and definition of "Acquired Assets."   The matter is clearly related to bankruptcy

under the standard set forth in *Marcus Hook* and *Allegheny Health*, is subject to the Court's

jurisdiction, and may be adjudicated here.  *See In re Marcus Hook,* 943 F.2d at 266; *In re*

*Allegheny Health*, 383 F.3d at 176.


## II.      Permanent Injunction

Injunctive relief is an extraordinary remedy that should be granted only in limited

circumstances.  *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer*

*Pharms. Co.,* 290 F.3d 578, 586 (3d Cir. 2002) (quoting *Instant Air Freight Co. v. C.F. Air*

*Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989)).  The party moving for a permanent injunction

must demonstrate: (i) that it suffered an irreparable harm; (ii) that remedies at law are inadequate

to compensate for that harm; (iii) that, balancing the harms suffered by both parties, an equitable

remedy is warranted; and (iv) that the public interest favors injunctive relief.  *See Monsanto Co.*

*v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

### A.      Irreparable Harm

An injury or harm is considered irreparable if an award of money damages would not be

capable of making an injured party whole.  *See Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir.

1977)) (noting that the harm "must be of a peculiar nature, so that compensation in money cannot atone for it."); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.") (citing *A.O. Smith Corp. v. Federal Trade Comm'n,* 530 F.2d 515, 525 (3d Cir. 1976)).   Interfering with a company's goodwill or causing a loss of trade may constitute irreparable injury. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.").   The Plaintiffs assert that they were irreparably harmed when the Defendants intentionally used the Debtor's customer information to contact consumers and make sales on behalf of New Biolitec.   They assert that this conduct violated the Sale Order and the automatic stay, causing the Debtor and AngioDynamics to lose trade and goodwill in the market for endovenous medical products.

Section 362(a)(3) enforces the automatic stay by prohibiting "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *see also Proyectos Electronicos, S.A. v. Alper*, 37 B.R. 931, 932 (E.D. Pa. 1983) ("Included among the activities stayed is any act to obtain possession of property of the estate or of property from the estate.   This includes any property over which the estate has control or possession.").   Property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).   The legislative history of section 541(a) makes clear that this definition is expansive and includes "all kinds of property, including tangible or intangible property . . . and all other forms of property specified in section 70(a) of the Bankruptcy Act." *In re Forman Enters*., 281 B.R. 600, 611 (Bankr. W.D. Pa. 2002) (citing *U.S. v. Whiting Pools*, 462 U.S. 198, 205 n.9 (1983)).   Goodwill is an intangible

22

asset consisting of the various qualities of a business that provide value above its value as a mere collection of assets.  *See* BLACK'S LAW DICTIONARY 715 (8th ed. 1999) (defining "goodwill" as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, especially for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets.").  In the context of a sale of a business, goodwill may be considered the value paid by the purchaser for "the expectancy of continued patronage" by the business's customers.  *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-56 (1993) (quoting *Boe v. Commissioner of Internal Revenue,* 307 F.2d 339, 343 (9th Cir. 1962)); *Heir v. Del. River Port Auth.*, 218 Supp. 2d 627, 641 (D.N.J. 2002) (describing "goodwill" as "that component of value attributable to a business' reputation in the community, loyal customer base and ability to attract new customers.").

Since entering the United States market for endovenous medical supplies in 2001, the Debtor developed extensive customer relationships and built up significant goodwill.  The Debtor had numerous customer contracts, including contracts to supply medical fibers to 20 vein doctors, and possessed valuable information regarding its customers' purchasing patterns and preferences.  (Sept. 30 Hr'g Tr. at 36:4-13)  Because this customer information was clearly in the possession of and controlled by the Debtor, it became subject to the protections of the automatic stay when the Debtor filed for bankruptcy.  Since the Debtor owned relatively few hard assets, AngioDynamics recognized the Debtor's customer relationships and goodwill as its most desirable assets in a potential sale.  (Oct. 1 Hr'g Tr. at 8:20-22)  For this reason, AngioDynamics insisted upon a review of the Debtor's customer files before agreeing to the settlement (as would most prospective purchasers) and refused to conclude negotiations until it received detailed information from the Trustee "regarding customer names, purchasing information, by product,

23

by month, over a period of time requiring at least the last six months of that data." (*Id.* at 6:23-7:3)  While the Trustee knew that the customer information was maintained on a server that some of the Defendants had access to, the Trustee did not believe that its location changed the fact that the customer list belonged to the Debtor. (Sept. 30 Hr'g Tr. at 29:22-30:2)  The Trustee's understanding was reasonable given that the Debtor was the only affiliate of the Biolitec Group selling medical products to customers in the United States. (Meyersiek Decl. at ¶¶ 2-3)  While the Biolitec Group may have had access to certain names and information, whatever value existed as a result of the customer list was created through the efforts of the Debtor, its employees, and sales representatives over a period of more than a decade.  Thus, the goodwill that existed in the United States market belonged to the Debtor, not the Biolitec Group.

In exchange for its purchase of the Debtor's goodwill and customer lists, AngioDynamics gave the Trustee significant consideration.  It paid $936,000 in cash and agreed to subordinate its $23 million claim against the Debtor, consideration valued at approximately $12.2 million.[3]  The sale documents reflect the Court's approval of the fact that the goodwill and customer information constituted property of the Debtor's estate and that the Trustee had the authority to sell these assets to AngioDynamics.  Section 1.1 of the APA defines "Acquired Assets" to include "all of the properties, assets, and rights of [the Debtor], wherever located, whether personal, tangible or intangible," and the Sale Order states that "[t]he Acquired Assets, other than any purported ownership interests in CeramOptec Industries, Inc. and Biolitec Medical Devices, Inc., are property of the Debtor's estate and title thereto is vested in the Debtor's estate."  (Sale Order at ¶ M)  To avoid any doubt that the sale would result in the transfer of the Debtor's customer information to AngioDynamics, the Sale Order explicitly stated

---

[3] The Court approved the Settlement Agreement and APA based in part on the credible testimony of Fred Caruso, insolvency and restructuring expert, who valued the consideration provided by AngioDynamics at approximately $12.2 million. (Oral Decision Tr. 17, Aug. 8, 2013, ECF No. 269)

that the "Debtor's affiliates . . . shall not exercise control over or use the Debtor's customer lists." (*Id.* at ¶ 31)  The Sale Order was not appealed by the Defendants.

The Defendants violated the automatic stay when they formed New Biolitec for the purpose of continuing Debtor's business and began using the Debtor's customer information and goodwill to sell products formerly provided by the Debtor during the period between August 9, 2013 through August 26, 2013, the closing of the sale.  (Sept. 30 Hr'g Tr. at 119:3-6; 133:3-1) Selling identical products through New Biolitec was clearly an intentional attempt to capitalize on the goodwill established by the Debtor with its customers in the United States market. Nowhere is this interference with estate assets more obvious than in the August 21, 2013 fact sheet distributed by New Biolitec to the Debtor's endovenous customers.  The fact sheet stated that "the same products that were formerly available from Biolitec, Inc. are still available from the Biolitec Group's exclusive U.S. medical distributor, Biolitec U.S., Inc." (Fact Sheet); (*Id.* at 138:12-15)  Thus, despite the Court's finding and approval of the fact that the Debtor's customer information and goodwill belonged to the estate and were to be included in the sale of substantially all of the Debtor's assets to AngioDynamics, and its explicit prohibition against the use of such customer information by the affiliates of the Debtor, New Biolitec used the Debtor's customer information to contact the Debtor's customers and solicit sales.   Contacting the Debtor's customers to inform them that the products formerly available from the Debtor were now available exclusively from New Biolitec was a flagrant attempt to usurp the Debtor's customer information and goodwill in violation of the Sale Order and automatic stay.   This conduct obviously interfered with and reduced the value of the customer lists and goodwill that belonged to the Debtor because it diverted sales and customer relationships away from the Debtor and in favor of New Biolitec.

The Defendants do not dispute that the terms of the APA and Sale Order clearly provide that the Debtor's goodwill and customer lists belonged to the estate and were intended to be sold free and clear to AngioDynamics pursuant to a section 363 sale.  They also readily admit soliciting the Debtor's former customers to purchase the same Biolitec Group medical products formerly purchased directly from the Debtor. (Defs.' Concl. Of Law at 5)  Nevertheless, the Defendants argue that their conduct did not violate the Sale Order because none of the Acquired Assets entitled AngioDynamics to the exclusive right to transact with the Debtor's customers. According to the Defendants, "the Biolitec Group maintained its own worldwide customer list as part its Customer Resource Management ('CRM') system, which included the Debtor's customers as well as other U.S. customers." (Defs.' Opp'n to AngioDynamics, Inc.'s Proposed Findings of Fact and Conclusions of Law at 2, May 27, 2014, ECF No. 118)  They assert that their conduct was legitimate because they used information stored on the CRM system (which, of course, included the customer information that belonged to the Debtor), as opposed to using the customer list owned by the Debtor, to contact the Debtor's former customers.  They ignore the fact that the Debtor's customer list was merely duplicated on the Biolitec Group's worldwide server and wrongly conclude that this duplication authorized its use.

This argument is untenable for several reasons.  First, the Defendants' conduct violated the clear language and intent of the Sale Order and its express proscriptions against interfering with the transfer of the Debtor's assets to AngioDynamics.  The sale and settlement documents reflect the importance of the customer information to the transaction, as emphasized in the provision of the Sale Order that prohibits the Defendants from using the Debtor's customer lists. By specifically stating that the "Debtor's affiliates . . . shall not exercise control over or use the Debtor's customer lists," the clear intent of the Sale Order was to prevent the Defendants from

continuing to do business with the customers on the list. (Sale Order at ¶ 31)  Regardless of

where a customer list is stored, the only useful purpose of the information contained therein is to

facilitate profitable relationships with customers, and only a company in the business of selling

to those customers may use or exercise control over such it.  When the Court entered the Sale

Order selling these assets to AngioDynamics, it did not intend to authorize the Defendants to

create a new entity to continue the Debtor's business with its former customers simply by

locating and using the same customer information that was to be sold to AngioDynamics on a

separate server.  Even though the Debtor's customer contracts did not obligate doctors to

purchase fibers from the Debtor, informing doctors that the fibers they formerly received from

the Debtor were now available exclusively through New Biolitec clearly interfered with the

Debtor's goodwill and customer relationships.  By "exercis[ing] control over property of the

estate" and reducing the value of assets in the possession of the Debtor, the Defendants violated

the automatic stay.  11 U.S.C. § 362(a)(3).

The Defendants' argument essentially asks the Court to accept that, despite the Debtor's

filing of a voluntary chapter 11 bankruptcy petition, the Biolitec Group was free at any time to

simply incorporate a new business, unencumbered by the Debtor's substantial liabilities, to

resume the Debtor's relationships with its customers and pick up the Debtor's business precisely

where it left off.  Such a result could not be further from the fundamental purposes of the

Bankruptcy Code, which seeks to maximize the value of the estate for the benefit of the Debtor

and its creditors.  The Debtor entered bankruptcy with a $23 million judgment against it and

relatively few assets from which creditors could recover due to the complex corporate structure

of the Biolitec Group and the Defendants' illegal and fraudulent conduct in transferring assets

out of the reach of creditors.[4]  Rather than seeking to use the chapter 11 process to reorganize and rehabilitate the Debtor's business, the Defendants sought to shed the Debtor's liabilities and destroy whatever value remained with the estate by starting up a new entity to usurp and benefit from the Debtor's goodwill and customer relationships.  Such improper conduct cannot be allowed.

In addition, the sale of the Debtor's assets free and clear pursuant to section 363 precludes the Defendants from asserting an ownership interest in the customer information.  The Sale Order was a legal, valid, and effective transfer, vesting AngioDynamics "with all right, title and interest of the Debtor to the Acquired Assets free and clear of any and all encumbrances." (Sale Order at ¶ P)  Accordingly, whatever ownership interest the Defendants may have had in the customer information by virtue of its access to such information via the global server was eliminated by the sale of this asset to AngioDynamics.  As discussed earlier, because the Sale Order clearly precludes the Biolitec Group from using or exerting control over the customer lists, the customer information could not be both sold to AngioDynamics and used by the Biolitec Group.  If the Defendants believed access to the Debtor's customer lists via their CRM system entitled them to a property interest in the customer information, it was essential that they raised this objection to the Sale Order.  Despite vigorously objecting to the settlement and sale, the Defendants did not object to the Debtor's sale of its goodwill, customer lists, or customer contracts or assert a property interest in any of these assets.  Indeed, at the sale hearing, the Defendants asserted multiple objections regarding the particular assets to be sold as property of the Debtor's estate, and successfully argued that two entities sought to be sold by the Trustee,

_____

[4] As noted, in addition to the $23 million judgment that the Debtor faced when it entered bankruptcy, a $74 million judgment was entered against the Defendants by the Massachusetts District Court due to their refusal to comply with discovery obligations and contempt orders issued in connection with their intentional violation of the merger injunction.  The actions in this Court are a further extension of conduct in other federal courts refusing to recognize or obey court orders.

CeramOptec Industries, Inc. and Biolitec Medical Devices, Inc., were not owned by the Debtor. (*See* Br. in Supp. of Objection to Settlement and Sale Mot. ¶ 32-33, In re Biolitec Inc., No. 13-11157 (Bankr. D.N.J. Aug. 1, 2013) ECF No. 227)   These assets were excluded by the Court from the definition of Acquired Assets and were not transferred as a result of the sale.  Because the Defendants did not object to this aspect of the sale, and did not appeal entry of the Sale Order, the Sale Order stands now as a final, non-appealable order.  Accordingly, AngioDynamics is the sole owner of such assets free and clear of all interests that may have been held by other entities.

Finally, representatives of New Biolitec continued to ignore this Court's orders even after the TRO was entered.  According to a certification submitted by Furcht in February 2014, Cote ignored the restraints by selling approximately $145,000 of vein products to companies owned by two of the Debtor's former customers after the TRO was entered.   (Furcht Decl. ¶¶ 3-4 February 21, 2014, ECF No. 83)   This conduct violated the express proscriptions of the Sale Order and TRO and resulted in further irreparable harm to AngioDynamics.

Thus, the Defendants' violations of the automatic stay, Sale Order, and TRO inflicted irreparable harm upon the Debtor and AngioDynamics. The unauthorized sales to the Debtor's customers lessened the value of the assets being purchased by AngioDynamics, diverted potential sales from AngioDynamics to New Biolitec, and created confusion amongst customers whose contracts were acquired by AngioDynamics.   Because the injuries suffered by the AngioDynamics are not easily measured and are unlikely to be remedied by an award of money damages, the Plaintiffs have demonstrated the existence of irreparable harm.

### B.      Inadequacy of Remedies at Law

The remedies available at law in this case are clearly inadequate because the injury to the Debtor's estate and AngioDynamics is not easily quantifiable and the likelihood of the Plaintiffs' being able to collect on an award of money damages is extremely tenuous.   Many of the Defendants are corporations located in foreign jurisdictions that do not allow enforcement of judgments entered in the United States.   In the Defendants' motion for reconsideration of the injunction issued in the Massachusetts Litigation, Judge Ponsor discussed AngioDynamics' ability to enforce a judgment against the Defendants: "[u]nder Austrian law, the parties agree that it would be flatly impossible to enforce any American judgment against [Biolitec AG]." *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 351 (D. Mass. 2012) *aff'd*, 711 F.3d 248 (1st Cir. 2013).   In a subsequent hearing on AngioDynamics's emergency motion for contempt, Judge Ponsor found that "the placement of Defendants' assets outside the reach of Plaintiff in the likely event that Plaintiff recovers judgment . . . was precisely the reason that Defendants went forward with" the merger with its Austrian subsidiary, and that "the record strongly supports the conclusion that bad faith was at the heart of Defendants' conduct and motivated their decision deliberately to defy the court's order."  *AngioDynamics, Inc. v. Biolitec AG*, 09-CV-30181-MAP, 2013 WL 1567739, at *5 (D. Mass. Apr. 11, 2013).

Here, the Defendants' violation of the Sale Order and automatic stay is merely the latest incident in a long list of bad faith conduct that reveals a pattern of systematically stripping assets from the Debtor in order to syphon them to related entities under common control and outside of the Court's reach.   AngioDynamics currently holds a judgment claim in the amount of approximately $74 against the Defendants in the Massachusetts Litigation, but as the court there found, "the merger has put Plaintiff in a substantially more difficult position in terms of

enforcing any judgment it might receive in this court." *AngioDynamics, Inc. v. Biolitec, Inc.*, 09-CV-30181-MAP, 2013 WL 5464627, at *5 (D. Mass. Aug. 27, 2013).  To date, the Defendants have been entirely successful in preventing AngioDynamics from collecting on the judgments rendered in the New York and Massachusetts litigations.  There is no reason to think AngioDynamics will have any better luck collecting on an award of money damages in this case, which has only reinforced the lengths that the Defendants are willing to go in order to avoid the negative consequences of court orders.  Because the multi-national nature of the Defendant corporations renders the recovery of a money judgment unlikely, such a judgment is not sufficient to redress the harm to the Plaintiffs in this case.  The facts clearly demonstrate that remedies at law are inadequate and that injunctive relief is needed to alleviate the injuries inflicted by the Defendants' conduct.

## C.      Balancing of the Harms

In balancing the respective hardships upon the Plaintiffs (if the injunction is not issued) and the Defendants (if the injunction is issued), the Court is convinced that failing to issue the injunction would result in greater harm to the Plaintiffs.  For the reasons just discussed, AngioDynamics will continue to be deprived of the benefit of its bargain and suffer continued harm that cannot be remedied through money damages if an injunction is not issued.  Conversely, any harm that accrues to the Defendants if a permanent injunction is issued is minimal.  First, the protections of the Bankruptcy Code are available to honest debtors seeking the best possible outcome for creditors and the estate.  The Code was not designed to allow a group of entities under common control to evade liability on a substantial judgment by filing for bankruptcy, selling all of the debtor's assets, incorporating a new entity in the middle of the proceeding to take over the debtor's business, and then profiting through that new entity.

31

Second, the proposed permanent injunction would keep the restrictions under the TRO in place for a period of two more years.  Significantly, the TRO only prohibits the Defendants from soliciting the Debtor's former vein customers and does nothing to prevent the marketing and sale of the Defendants' products in other product markets.  Thus, the restraints allow the Defendants to continue to operate and sell their products in other markets and are no broader than necessary to protect the interests acquired by AngioDynamics.

### D.    Public Interest

With respect to the final factor, the Court is also of the opinion that granting the Plaintiffs' requested relief is in the public interest.  The Defendants' contention that injunctive relief would interfere with the rights of doctors to select the medical supplier of their choice is overcome by the credible and consistent testimony of both parties' experts regarding the functional interchangeability of Biolitec and AngioDynamics products.  Because the testimony from both parties consistently reflects the ease in transition between the products, any concerns regarding the public interest in protecting a doctor's choice are minimal.

Moreover, the public interest favors enforcement of this Court's Sale Order and previous orders appointing the Trustee and approving the APA.  The Defendants' deliberate interference with estate assets is contrary to the primary goal of the bankruptcy process.  The entry of a permanent injunction serves to preserve the value of the Debtor's estate, enforce the Sale Order and thereby allow AngioDynamics to proceed with the benefit of its bargain, without unlawful interference, and to maintain the integrity of the bankruptcy sale process.  Thus, applying the four-prong test for the issuance of a permanent injunction to the present matter, the Court concludes that the Plaintiffs have satisfied their burden.

## CONCLUSION

For the reasons set forth above, the Plaintiffs' request for preliminary and permanent injunctive relief is granted.  The restraints provided for in the TRO are hereby made permanent for a period of two years following entry of this Court's Order.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.


s/ *Donald H. Steckroth*
_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated:    January 22, 2015